**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF RHODE ISLAND**

_____

In re:   Philippe Nadeau and                                         BK No: 13-13098
         Paulette C. Nadeau,                                         Chapter 7
         Debtors
_____

## DECISION AND ORDER

Philippe and Paulette Nadeau filed a Chapter 7 voluntary petition, the United States Trustee ("UST") moved to dismiss the Nadeaus' case for abuse pursuant to Bankruptcy Code section 707(b)(1), and the Nadeaus objected to that motion.[1] The Court held an evidentiary hearing on the motion and objection on July 24, 2014, and this decision constitutes my findings of fact and conclusions of law. After careful consideration of the testimony, the exhibits introduced into evidence, and the arguments of the parties, I conclude that the Nadeaus filed their petition in bad faith and that the totality of the circumstances of the Nadeaus' financial situation demonstrates abuse.

## Jurisdiction

The Court has jurisdiction over this motion under 28 U.S.C. §§ 157 and 1334 and DRI LR Gen 109(a). This is a core proceeding as designated under 28 U.S.C. § 157(b)(2)(A), (J), (O).

## Background and Stipulated Facts

The Nadeaus live in Tiverton, Rhode Island, have no children or other dependents, and have worked for their respective present employers for more than 14 years. (Joint Pre-Trial Statement, Doc. #28 ["JPTS"] ¶¶ 2, 10-11). Mr. Nadeau is a chef employed by the United States

---

[1] Unless otherwise indicated, the terms "Bankruptcy Code," "Chapter," "section" and "§" refer to Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub L. No. 109-8, 119 Stat. 37 ("BAPCPA").

1

Navy at a facility in Newport, Rhode Island, and Mrs. Nadeau is a certified nursing assistant working at a senior care facility in Bristol, Rhode Island. (JPTS ¶¶ 12-13).

In the summer of 2013, the Nadeaus, due to financial burdens, met with and hired a bankruptcy attorney, made the decision to file for Chapter 7 bankruptcy protection, and took the required pre-bankruptcy credit counseling course. (JPTS ¶¶ 16-18). Between September 6, 2013 and November 5, 2013, the Nadeaus paid their attorney $1,500. (JPTS ¶¶ 19-20). On or about September 13, 2013 – seven days after making the first fee payment of $200 to their bankruptcy attorney and six days after taking the credit counseling course – Mr. Nadeau bought a new red, two-seat, 2013 Nissan 370Z coupe (the "370Z"). (JPTS ¶ 21). He purchased this vehicle under an installment contract, with a loan amount in excess of $40,000 secured by a lien against the vehicle. (JPTS ¶ 22). As part of the transaction, the Nadeaus traded in their relatively new 2012 Toyota Camry sedan (the "Camry") that had approximately 6,500 miles. (JPTS ¶ 23). The outstanding balance of their loan on the Camry was more than $29,000, which was rolled into the loan for the 370Z, resulting in a net transaction in which the Nadeaus incurred approximately $12,000 in additional debt. (JPTS ¶ 24).

Ten weeks after purchasing the 370Z and only three weeks after making their final fee payment to their bankruptcy attorney, the Nadeaus sought bankruptcy protection under Chapter 7. In the requisite filings accompanying their petition, the Nadeaus indicated that their debts were primarily consumer debts and that they intended to retain and reaffirm the debts on their home, the 370Z, and a 2011 GMC Acadia.[2] (JPTS ¶¶ 9, 27; Voluntary Pet., Statement of Intention,

---

[2] The Nadeaus purchased the Acadia, which is primarily driven by Mrs. Nadeau, in January 2012. (JPTS ¶ 26).

Doc. #1). The Nadeaus also listed a total of $28,116 in unsecured debt and estimated there would be no funds available for distribution to unsecured creditors. (JPTS ¶ 31; Voluntary Pet., Schedule F, Doc. #1).

Following the meeting of creditors, the UST moved to dismiss the Nadeaus' case under section 707(b)(1) and (3), challenging the petition as being filed in bad faith and asserting that the totality of the circumstances demonstrates that the filing constitutes an abuse of Chapter 7. (Doc. ## 13, 27). The Nadeaus objected to that motion, arguing that there was no bad faith and that their circumstances do not demonstrate abuse of the Chapter 7 provisions. (Doc. ## 16, 22). The parties agree that the Court has jurisdiction over the UST's motion and that this is a core proceeding. (JPTS ¶ 5).

## The Evidence

During the hearing, Mr. Nadeau was first questioned by the UST as part of the presentation of the UST's case. Mr. Nadeau testified that the couple purchased their home in Tiverton in November 2012, and that at about the same time they also purchased the 2012 Camry. (Hr'g Tr., Doc. #40 ["Tr."] at 25).[3] Mr. Nadeau testified that in January 2013 the Camry was stolen from his driveway and sustained about $10,000 in damage. (Tr. 26-30). Mr. Nadeau explained that the car was towed to a Toyota dealer in Newport, where it was repaired and then returned to them sometime in February 2013. (Tr. 30-31). According to his testimony, "It never was the same, breaking, noise, tire noise, paranoid to drive it, paranoid for my wife to drive it. It took me six months to try to get rid of that car. It was just unsafe." (Tr. 31). Asked in what way it was unsafe, he responded, "Most of the damage was done to the front of the car, the bearings, the

---

[3] An audio file of the hearing is available on the Court's docket at Doc. #37.

3

bushings. They couldn't line up the wheels right." *Id*. The UST questioned further, "So you're saying, when you picked up the car, the repairs weren't done properly?" Mr. Nadeau answered, "Right. That's what I'm saying." *Id*. But when questioned regarding his follow-up on these allegedly faulty repairs, he admitted that he had not brought the car back to the same or a different mechanic or body shop for further inspection or repair, nor did he contact his insurance company to inform it that the repairs were not done properly and the car was unsafe to drive. (Tr. 31-35). Instead, the Nadeaus continued to drive the Camry for the next several months until trading it in for the 370Z in September 2013. (Tr. 35).

Turning to the purchase of the 370Z, Mr. Nadeau testified:

> I was driving by with the Camry and I saw $30,000 on the window [of the 370Z on the dealership lot]. I pulled in and I says, "How many miles on the red car out there?" He says, "It's not," -- I mean, I says, "is it used?" And he says, "No. It's a leftover '13. We are trying to get rid of it. It's fall. We reduced it."

(Tr. 36).

In an effort to justify the purchase of the 370Z he emphasized that he "didn't feel safe in the Camry." (Tr. 37). Upon inquiry by the UST whether prior to purchasing the 370Z he test-drove any other vehicles, Mr. Nadeau admitted that he had not. (Tr. 42). He did, however, state that he had been to other dealerships but that they "didn't want to touch [the Camry]." *Id*. The UST questioned Mr. Nadeau repeatedly about what dealerships he had visited, whether he had discussed his finances with any other dealers, and what other specific vehicles he considered buying. But Mr. Nadeau's responses were very general and in contradiction with testimony he

4

gave at his deposition. (Tr. 42-52).[4] Frankly, I find these explanations vague and not credible. Mr. Nadeau acknowledges that the monthly installment payments on the 370Z loan are $133 more than their previous payments on the Camry, but he indicated that the purchase price was reduced because they bought it in the fall and it was "not a winter car" and would not drive well in snow and ice. (Tr. 35, 57, 78).

Focusing on the Nadeaus' decision in late summer of 2013 to file for bankruptcy, Mr. Nadeau described the couple's financial distress resulting from their mounting debt: "I didn't have the money to pay the creditors and I was worried about paying the house loan and car loans." (Tr. 60). He added that they "didn't have any money left," and they filed for bankruptcy so they "wouldn't lose the house and the other cars." (Tr. 61). In short, by filing under Chapter 7, the Nadeaus sought to retain their home and any vehicles they owned or purchased prior to filing and obtain relief from their substantial unsecured debt by discharging such obligations.

Finally, the UST questioned Mr. Nadeau about his income and whether he received a raise at the beginning of 2014. Mr. Nadeau testified that he did but that it was "pennies," "30 cents, or 40 cents, or something like that." (Tr. 62).[5] He noted that on Schedule I he listed his income as $3,572.83 per month, and several of his 2014 pay advices were admitted into

---

[4] For example, at the hearing Mr. Nadeau testified that he had been to more than 10 car dealers between the time the Camry was repaired and when he purchased the 370Z, and he named several of those dealers. (Tr. 42, 46-47). However, at his deposition Mr. Nadeau named only one dealer he had visited. (Tr. 48). When the UST's counsel noted the discrepancy, Mr. Nadeau stated regarding the deposition, "It was very hot, and you were throwing questions at me very fast, and it got to the point I couldn't even answer them anymore." (Tr. 48-49).

[5] At the hearing, the parties disagreed about whether in deciding this motion I should consider evidence of the Nadeaus' post-petition income. While I offered the parties an opportunity to brief the issue after trial, they ultimately filed a stipulation agreeing that "evidence presented of post-petition circumstances through the hearing date may be considered by the Court in the totality of circumstances analysis pursuant to section 707(b)(3)." *See* Doc. #41.

evidence. Those pay advices were addressed more specifically by a subsequent witness presented by the UST.

Mr. Nadeau then was questioned by his own counsel and gave additional testimony about the damage sustained by the Camry in January 2013. When it was recovered, the wheels were "all crooked" and "the whole car was bent." (Tr. 86). The repairs to the car, he said, cost approximately $10,336, which was paid by the Nadeaus' insurer. (Tr. 90). Because of the repairs, he "didn't feel good about" the safety of the Camry; when he hit the brakes, the car would pull to the left or the right, and when he put it in park there would be a "big thump." *Id*. Mr. Nadeau asserted that after the repairs were made he decided to "try to get into another car," because he was scared of he and his wife driving it, and he needed a "safe and reliable" car to perform his job, which is located about 25 miles from his home. (Tr. 91-92).

In response to his attorney's question, "[D]id you intentionally go out and look for a sports car two months before filing your bankruptcy?," Mr. Nadeau answered "no." (Tr. 95). And when asked by his counsel, "Did you intentionally go out and get a higher car payment of approximately $133 prior to filing your bankruptcy to hinder, defraud, or delay any creditor?," he again answered "no." (Tr. at 95).[6]

Delving further into their finances, Mr. Nadeau also testified about their household expenses listed on Schedule J (such as food, transportation, and recreation), based upon which the Nadeaus' attorney later argued that the totality of the Nadeaus' expenses does not demonstrate bankruptcy abuse under Chapter 7. (Tr. 99-100, 152-53). Lastly, Mr. Nadeau

---

[6] I pause here to note that the UST need not prove that the Nadeaus intended to hinder, defraud, or delay creditors; rather, the UST's burden is to establish that the Nadeaus filed their petition in bad faith or that the totality of the circumstances of their financial situation demonstrates abuse. *See* 11 U.S.C. § 707(b)(3).

6

testified that within a year or so prior to filing their bankruptcy petition, he and his wife suffered "catastrophic economic events" that affected their finances, including septic system repairs "approaching over $2,000" and the removal of a metal stove costing over $1,000. (Tr. 101-03).

The only other witness to testify at the hearing was David Quinn, a bankruptcy analyst in the office of the UST, who was presented by the UST. Mr. Quinn is a certified public accountant and his testimony was admitted as that of an accounting expert qualified to testify regarding "mathematical calculations." (Tr. 111-13). He indicated that he had reviewed the Nadeaus' Schedule I, as well as Mr. Nadeau's January through May 2014 pay advices that were admitted into evidence. He concluded that Mr. Nadeau's "monthly average gross [income] for the period from January 3rd, 2014 to May 9th, 2014 was $233.80 higher than the Schedule I monthly gross income." (Tr. 113-16). On cross-examination, Mr. Quinn was asked to perform a series of calculations relating to Mr. Nadeau's income as listed on Schedule I and on the pay advices. (Tr. 117-41). This line of questioning was confusing and not helpful to clarify disputed issues concerning Mr. Nadeau's increase in income post-filing. Ultimately, however, the numbers speak for themselves. It is clear that his pay advices reflect an increase in his income from that reported on Schedule I that was not mere "pennies" as characterized by Mr Nadeau.[7]

---

[7] Mr. Nadeau did not testify or present any other evidence to show that these 2014 pay advices were inaccurate or that his income was expected to decrease in the future.

### **Findings of Fact and Conclusions of Law**

Section 707(b) authorizes the dismissal of this case, or alternatively with the Nadeaus' consent its conversion to a proceeding under Chapter 13, if I find that granting the Nadeaus Chapter 7 relief would be an abuse of bankruptcy. 11 U.S.C. § 707(b)(1). In considering whether such abuse would arise from relief under this chapter, I must determine (a) whether the Nadeaus filed their petition in bad faith or (b) whether the totality of the circumstances of the Nadeaus' financial situation demonstrates abuse. *Id*. § 707(b)(3). As the moving party, the UST bears the burden of proving by a preponderance of the evidence that the Nadeaus' filing constitutes an abuse of Chapter 7. *In re Hoffman*, 413 B.R. 191, 194 (Bankr. M.D. Pa. 2008).

Bad Faith Analysis

A "bad-faith filing" is "a bankruptcy petition that is inconsistent with the purposes of the Bankruptcy Code." *Black's Law Dictionary* 166 (10th ed. 2014); *see also In re Webb*, 447 B.R. 821, 824 (Bankr. N.D. Ohio 2010). A paramount goal and "[t]he principal purpose of the Bankruptcy Code is to grant a fresh start to the honest but unfortunate debtor." *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 367 (2007) (internal quotations omitted); *see also Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 192 (1902); 1 *Collier on Bankruptcy* ¶ 1.02[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev. 2014) (stating that a discharge "enables the debtor to begin a new financial life"). Here, the UST contends that the Nadeaus' conduct – deciding to file Chapter 7 bankruptcy and discharge the debts of unsecured creditors, then incurring additional debt to purchase the 370Z, and then filing their petition with the stated intention to reaffirm that newly incurred debt – is inconsistent with the purpose of a fresh start for the honest debtor. The Nadeaus, on the other hand, counter that they did not intend to take

advantage of their creditors; rather, they assert, they feared for their safety driving the Camry and purchased the only available vehicle after looking for a replacement.

I find the timing of the events and the Nadeaus' actions preceding the filing of this case the most telling evidence of their bad faith filing and the abuse of bankruptcy. Unequivocally, Mr. Nadeau testified that he and his wife decided to file for Chapter 7 bankruptcy protection because they were worried about being able to continue paying their mortgage and their car loans. They simply could not afford to also continue paying their substantial credit card debt, he testified, alleging that they had over the years paid approximately $15,000 towards such obligations. (Tr. 60). Despite their financial burdens, and only *after* they received bankruptcy counseling from their attorney, engaged him to prepare and file a Chapter 7 bankruptcy case, and completed the mandatory credit counseling course, they traded in the Camry for the more expensive 370Z. In doing so they knowingly incurred in excess of $12,000 in additional debt and a new monthly installment payment that was $133 greater than their prior monthly payment for the Camry.

Even if I were to give the Nadeaus the benefit of the doubt regarding their concerns about the safety of the Camry, they produced no evidence that the Camry was unsafe, other than the subjective, self-serving statements of Mr. Nadeau. Moreover, they never pursued additional repairs to the vehicle, nor did they notify or complain to their insurance company, which had paid more than $10,000 for the repairs. Instead, the Nadeaus continued to drive the Camry for about seven months after it was repaired until they had decided to file for bankruptcy and seek a discharge of their unsecured debt. It is abundantly clear, and based on the evidence presented I find, that they were determined, irrespective of the added expense, to unload the Camry and

9

acquire a new vehicle before they filed their bankruptcy petition. Mr. Nadeau appears to have been irresistibly drawn to the new, sporty 370Z as soon as he spied it on the dealership lot, and he pursued its acquisition despite his admission that it was not a reliable car for Rhode Island's often harsh winters and his stated need for a reliable and dependable vehicle for his work commute.

The bottom line is that the Nadeaus, while struggling to make the monthly payments on their home mortgage and their vehicles, as well as to pay their other bills, incurred an increased financial burden of $133 in additional monthly payments because they anticipated being able to discharge all of their unsecured debt in a Chapter 7 bankruptcy, rendering these increased payments on the 370Z affordable. This is not the conduct of an unfortunate, honest debtor for whom a fresh financial start is the intended economic goal of bankruptcy. *See In re Brenneman*, 397 B.R. 866, 875 (Bankr. N.D. Ohio 2008) ("[T]he reaffirmation process in a Chapter 7 bankruptcy was not meant to be used as a device by which debtors could retain unnecessary property to the detriment of their unsecured creditors."). The lapse of 10 weeks between the purchase of the 370Z and the date of the actual petition filing is not, as the Nadeaus posit, meaningful under these circumstances. The timing of the filing has more to do with the date when the final pre-petition retainer was paid to their attorney (about three weeks prior to their Chapter 7 filing). Some two months between the purchase of the 370Z and the petition filing cannot shield the Nadeaus from the fact that to acquire this new sporty vehicle they increased their financial indebtedness at a time when they were already living well beyond their means, and did so only after they had decided to file bankruptcy and taken substantial steps to implement that decision. The Nadeaus' Chapter 7 filing, I conclude, was not in good faith.

10

Totality of the Circumstances Analysis

I have also considered the totality of the circumstances of the Nadeaus' financial situation in determining the issue of bankruptcy abuse under section 707(b). My analysis is informed by the factors laid out in *First USA v. Lamanna (In re Lamanna)*, 153 F.3d 1, 4 (1st Cir. 1998); *see also In re Boule*, 415 B.R. 1, 5 (Bankr. D. Mass. 2009) (explaining that *Lamanna*, the pre-BAPCPA test, remains applicable post-BAPCPA). In *Lamanna*, the First Circuit adopted several nonexclusive factors from the Sixth Circuit's decision in *In re Krohn*, 886 F.2d 123 (6th Cir. 1989). A key factor is a debtor's ability to repay his debts out of future disposable income, which, if present, is strong evidence of abuse. *Lamanna*, 153 F.3d at 4. Other factors that may be considered include (1) whether the debtor is seeking an advantage over his creditors, (2) whether the debtor enjoys a stable source of future income, (3) whether the debtor is eligible for Chapter 13, (4) whether there are state remedies with the potential to ease the debtor's financial predicament, (5) the degree of relief obtainable through private negotiations, and (6) whether the debtor's expenses can be reduced significantly without deprivation of adequate food, clothing, shelter and other necessities. *Id.*; *Krohn*, 886 F.2d at 126-27.

In summary, the totality of the circumstances test requires "a comprehensive review of the debtor's current and potential financial situation." *Lamanna*, 153 F.3d at 4. Here, because the Nadeaus both have been employed by their current employers for more than 14 years, and because no evidence was presented suggesting that their incomes or expenses are likely to change (except perhaps positively in light of Mr. Nadeau's post-petition raise), their current and potential future financial situation is stable, at least as far as can be predicted.

A review of the Nadeaus' income and expenses shows that they do indeed have the ability to repay a meaningful portion of their unsecured debts (scheduled as $28,116) out of their future disposable income. The Nadeaus' Schedules I and J show monthly disposable income of about $76. As of the hearing date, though, the evidence reveals that Mr. Nadeau's present (and likely future) monthly gross income is $233 more than his monthly gross income listed on Schedule I, leaving the Nadeaus with about $146 per month in additional disposable income. When these figures are combined ($76 + $146 = $222), the Nadeaus – even after incurring the increased monthly loan payment for the 370Z – have future disposable income available to repay a significant portion of their unsecured debts over the term of a Chapter 13 plan. And finally, if the Nadeaus had not purchased the 370Z after deciding to file for Chapter 7 bankruptcy, and instead had retained the Camry, their expenses would be $133 per month lower, leaving them monthly disposable income of $355. Such disposable income would have provided for an even greater dividend to their creditors. While it might be too late for the Nadeaus to reverse this additional debt obligation resulting from this purchase, this aspect of their prior financial ability-to-repay is just additional support for a finding of bankruptcy abuse.

I further find that the Nadeaus took unfair advantage of their creditors, even if that was not their direct intent, by purchasing the new 370Z after they had decided to file for Chapter 7 bankruptcy. Viewing the totality of the circumstances of the Nadeaus' financial situation, I conclude that granting them Chapter 7 relief would be an abuse of bankruptcy.

**Conclusion**

The UST has met his burden and established that the Nadeaus filed their petition in bad faith and also that the totality of the circumstances of their financial situation demonstrates abuse under section 707(b). I will afford the Nadeaus the opportunity to avoid dismissal of their case if, within 30 days of the date of this Decision and Order, they file a notice of conversion of this case to Chapter 13 together with a proposed Chapter 13 plan. If they do not do so, the UST's motion will be granted and the case will be dismissed without further notice or hearing.

Dated:  October 17, 2014                                              By the Court,

                                                                    /s/ Diane Finkle
                                                                    _____
                                                                    Diane Finkle
                                                                    U.S. Bankruptcy Judge